943 So.2d 1209 (2006)
ST. JOHN THE BAPTIST PARISH and Frisco Hunting Club and Tattoon's Hunting Club and St. John Hunting Club and Reserve Hunting and Fishing Club and Dirty Dozen Camp, and Reserve Gun and Rod Club
v.
STATE of Louisiana, DEPARTMENT OF WILDLIFE AND FISHERIES.
No. 05-CA-1002.
Court of Appeal of Louisiana, Fifth Circuit.
October 17, 2006.
*1210 Joel T. Chaisson, Attorney at Law, Destrehan, Louisiana, Catherine Leary, Westwego, Louisiana, for Plaintiff/Appellee.
Frederick C. Whitrock, Donald E. Puckett, Louisiana Department of Wildlife & Fisheries, Attorney at Law, Charles C. Foti, Charles F. Perry, Baton Rouge, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., MARION F. EDWARDS, SUSAN M. CHEHARDY, WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
WICKER, Judge.
This is an injunction and declaratory judgment action. Defendant, State of Louisiana, through the Department of Wildlife & Fisheries ("DWF"), appeals from a judgment granting plaintiff, St. John the Baptist Parish ("the Parish"), a permanent injunction prohibiting DWF from removing, destroying or dismantling certain camps and related structures within the Parish's right of use servitude area as declared by the trial court. For the following reasons, we reverse the judgment of the trial court.
In January of 1952, the Parish and Lutcher & Moore Cypress Lumber Company, Ltd. ("L & M") entered into an agreement ("1952 Agreement") wherein L & M granted the Parish a servitude to construct a drainage canal ("Reserve Canal") through their property. Shortly afterwards, the Parish dredged Reserve Canal within the boundaries provided in the 1952 Agreement. Subsequent to the construction of the Reserve Canal, L & M executed camp site lease agreements respecting five tracts of land immediately adjacent to the canal, one each to: Reserve Rod and Gun Club; Dirty Dozen Camp; St. John Hunting Club; Tattoon's Hunting Club; and Reserve Hunting and Fishing Club (referred to hereafter collectively as "the hunting clubs"). Each of the hunting clubs constructed buildings and associated structures immediately adjacent to Reserve Canal. During the time period prior to 2001, the hunting clubs did not seek or obtain the Parish's permission for their activities; further, the Parish did not issue or enter into leases with the hunting clubs or their predecessors. In June 2001, L & M notified the hunting clubs that their camp site lease agreements with L & M would not be renewed, and that any and all rights that they had with respect to their leases would be terminated on June 30, 2001. Shortly thereafter, approximately 23,913 acres, including Reserve Canal and the property surrounding Reserve Canal, were donated to DWF and established as the Maurepas Swamp Wildlife Management Area ("MSWMA"). Each of the hunting clubs subsequently received two certified letters from DWF, the first dated August 28, 2001 and the second, November 13, 2001. In the August 28, 2001 letter, DWF stated that MSWMA would be managed to provide wildlife habitat and outdoor recreational opportunities for all citizens of the State of Louisiana; all private camps on the MSWMA must be removed or abandoned because, "[u]nfortunately, camps on the State's public Wildlife Management *1211 Areas are not consistent with Department policy or the Deed of Donation." The hunting clubs were given through October 31, 2001 to remove all of their personal belongings and salvage their camps; after that date, through January 31, 2002, no one would be permitted to use or occupy the camps. From February 1, 2002 through June 30, 2002, the hunting clubs could apply for a special permit to continue to salvage their camps during this period; as of July 1, 2002, all camps would be considered salvaged and DWF would take possession. In the November 13, 2001 letter, DWF noted that the hunting clubs had expressed concern about not having enough time to remove their camps; therefore, DWF decided to allow the hunting clubs to use the camps through February 1, 2002, provided they would make an effort to begin dismantling the camps. DWF also stated that it was considering supplying a barge to assist camp owners in transporting dismantled camps and materials to a central location. The July 1, 2002 deadline remained the same. On or about March 26, 2002, the hunting clubs donated whatever interest they had in the buildings and associated structures to the Parish, which, in turn, without advertising for, or otherwise seeking, public bids, leased the donated buildings and associated structures back to the hunting clubs.
On March 27, 2002, the Parish, the hunting clubs, and Frisco Hunting Club[1] filed a petition for declaratory judgment, temporary restraining order, preliminary and permanent injunctions against DWF to "resolve a dispute over ownership of certain real property" located in the Parish. The Parish contends that the rights granted to it under the 1952 Agreement "include the right to own and maintain physical improvements (such as the hunting camps) on the property if these physical improvements are of benefit to the Parish in maintaining and operating the permitted canal or otherwise of benefit to the Parish." The Parish further contends that its rights include the right to lease the physical improvements in the permitted area on terms similar to the leases granted to the hunting camps. Accordingly, plaintiffs' petition seeks a declaratory judgment recognizing the Parish's interest in the property, its right to execute leases of the property or portions thereof, and the validity of the leases to the clubs and the rights of the clubs pursuant to the leases. Further, plaintiffs' petition seeks a temporary restraining order[2] and preliminary and permanent injunctions prohibiting DWF from interfering with plaintiffs' peaceable possession of the property.
On April 2, 2002, DWF filed a declinatory exception of improper venue, contending that this action can only be properly maintained in the domicile of the DWF, the Nineteenth Judicial District Court for the Parish of East Baton Rouge. The trial court denied the exception and, on October 16, 2002, this Court affirmed the judgment of the trial court. This Court reasoned that because the servitude in this case is a personal servitude of right of use (La.C.C. art. 639), "a form of real property," venue is proper where the real property in dispute is located, i.e., the Parish, pursuant to La.C.C.P. art. 80. St. John the Baptist Parish v. State ex rel. Dept. of Wildlife & Fisheries, 02-612 (La.App. 5 Cir. 10/16/02), 828 So.2d 1229, 1233 writ denied, 02-3136 (La.3/14/03), 839 So.2d 40.
This matter was heard on May 24, 2005, at which time the parties filed a stipulation *1212 of facts. The record includes the depositions of Allen St. Pierre (former Director of Public Works for the Parish), Irvin Tregre (Road and Bridge Manager for the Parish), Davis Madere, Jr. (St. John Hunting Club member), Ricky Jacob (President of the Reserve Gun and Rod Hunting Club), and Dean Torres (Tattoon's Hunting Club member). Additionally, the parties submitted memoranda.
After taking the matter under advisement, the trial court rendered and signed a judgment on September 12, 2005, with attached reasons, finding:
That St. John the Baptist Parish enjoys concurrent personal and predial servitudes of rights of use of the Reserve Canal, which servitudes encompass the entire width of the Reserve Canal at its high water mark, and an additional fifty (50) feet on each side of the canal, from its high water mark, said servitudes being no less than one hundred fifty (150) feet wide at any point; and
That the Louisiana Department of Wildlife and Fisheries is the owner of the camp structures located both on the Parish servitude and beyond the Parish servitude; and
That the camp buildings and related club activities have become necessary to St. John the Baptist Parish for the enjoyment of its servitudes, and the camp buildings impose neither a greater burden nor a significant inconvenience to the Louisiana Department of Wildlife and Fisheries; and
That because irreparable harm would occur to St. John the Baptist should the camps be removed or destroyed, the Parish is entitled to a Permanent Injunction against the Louisiana Department of Wildlife and Fisheries, prohibiting it from removing, destroying or dismantling the camps and related structures located within the Parish servitude; and
That St. John the Baptist is within its rights of servitude to enter into leases that further the legitimate purposes of the servitude, limited to the existing buildings . . .
DWF appeals, assigning as errors all of the above findings, except for the trial court's ruling that DWF is the owner of the camp structures located both on the Parish servitude and beyond the Parish servitude.
LAW AND ANALYSIS
Personal and Predial Servitudes
There are two kinds of servitudes, personal and predial. La.C.C. art. 533. A personal servitude is a charge on a thing for the benefit of a person. La.C.C. art. 534. The personal servitude of right of use confers in favor of a natural person or a legal entity a specified use of an estate less than full enjoyment. La.C.C. arts. 639, 641. Predial servitudes may be established by an owner on his estate or acquired for its benefit; they are established on, or for the benefit of, distinct corporeal immovables. La.C.C. arts. 697-698. A predial servitude is further described as a charge on a servient estate[3] for the benefit of a dominant estate. La.C.C. art. 646. The two estates must belong to different owners. Id. In the present matter, we find that the 1952 Agreement confers only a personal servitude of right of use, i.e., it confers in favor of a legal entity (the Parish), a specified use of an estate (the right to use L & M's property to "construct, maintain and operate . . . one single continuous drainage canal"), less than full enjoyment. *1213 Accordingly, the trial court erred in ruling that the Parish enjoys concurrent personal and predial servitudes of right of use of the Reserve Canal.
Use and Extent of the Servitude
A right of use servitude is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude. La.C.C. art. 645. Accordingly, a voluntary or conventional right of use servitude may be established by juridical act. A juridical act is a lawful volitional act intended to have legal consequences; it may be a unilateral act, such as an affidavit, or a bilateral act, such as a contract, and onerous or gratuitous. See, section (c) of the 1982 Revision Comments to La.C.C. art. 3471. A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La.C.C. art. 1906.
In the present matter, the servitude of right of use was established by contract, the 1952 Agreement. The use and extent of the servitude is regulated by this contract. La.C.C. art. 697. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La.C.C. art. 2046.
The 1952 Agreement provides that the Parish is granted permission to construct, maintain and operate one single continuous fifty feet wide drainage canal, "for drainage purposes only," over and across a one hundred and fifty feet wide strip of land, with, "[t]he center line of said drainage canal to be located (allowing reasonable deviation due to the nature of the construction) on and along the center of the strip of land hereinabove described." Therefore, the clear and explicit words of the contract provide that the servitude is limited to a one hundred fifty feet wide strip of land. Accordingly, we find that the trial court erred when it found that the servitudes encompass the entire width of the Reserve Canal at its high water mark and an additional fifty feet on each side of the canal, from its high water mark, said servitudes being no less than one hundred fifty feet wide at any point.
Exercise of the Servitude
The 1952 Agreement states that any "spoil" from the construction of the drainage canal "shall be deposited on both banks of said drainage canal." Additionally, it provides, in pertinent part:
It is further distinctly understood and agreed that the permit herein granted for the construction of the drainage canal shall be for drainage purposes only and for no other purposes, and Lutcher & Moore Cypress Lumber Company, Ltd. Specifically declares that it does not by this instrument in any manner convey any right, title or interest in or to the fee of any of the property hereinbefore described or to any minerals underlying same. (emphasis added)
Further, the 1952 Agreement obligates the Parish "to keep and maintain the drainage canal . . . open and free from obstructions to drainage." Pursuant to La.C.C. arts. 645 and 745, the Parish has the right to enter with its workmen and equipment into the part of the DWF's property that is needed for the construction or repair of works required for the use and preservation of the servitude. La. C.C. art. 745. The Parish may deposit materials to be used for the works and the debris that may result, under the obligation of causing the least possible damage and of removing them as soon as possible. Id.
Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested *1214 by the contract as a whole. La.C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages and the conduct of the parties before and after the formation of the contract. La.C.C. art. 2053. In the case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation. Doubt as to the manner of exercise of a servitude shall be resolved in favor of the servient estate (DWF). La.C.C. art. 730.
After the formation of the servitude contract and the construction of Reserve Canal, L & M executed agreements with the hunting clubs respecting tracts of land immediately adjacent to the canal. The record includes a copy of a June 13, 2000 "Camp Site Lease Agreement," between L & M and Reserve Hunting and Fishing. The parties stipulate that each of the other camps signed an agreement which is identical to it, except for the identifying language specific to each individual hunting club. Therein the hunting clubs were granted "the exclusive (except as herein provided) right to use the leased premises for a camp site." The leases were made, "specifically subject to any existing or future oil, gas or mineral leases on the property." The hunting clubs were prohibited from cutting, injuring, damaging, or destroying any timber on the premises, as well as, extracting, killing or otherwise taking any fish or game on the premises. However, no reference is made therein to the 1952 servitude agreement. During the time period prior to 2001, the hunting clubs did not seek or obtain the Parish's permission for their activities and the Parish did not issue or enter into leases with the hunting clubs or their predecessors. This is indicative of and consistent with the Parish having a limited personal servitude of right of use.
The record also includes testimony regarding the Parish's maintenance of the canal and hunting club members' activities on the property. Irvin Tregre testified that he works for the Parish as Road and Bridge Manager. His duties include maintaining, constructing, and repairing drainage canals, including Reserve Canal. He has supervised parish workers in removing limbs, trees, and other potentially harmful "stuff" from the canal. Tregre testified that they, "just monthly find out if they [boaters] got anything bothering them or if they got any trees that fell, you know, because they pass back there regular than us, the boat people, you know." He stated that in recent years, the Parish has hired a contractor to remove stumps in the canal and falling trees. The contractor used a barge with equipment on it to accomplish the job. Occasionally, the Parish will "grub the bottom" of the canal, i.e., take mud from the bottom of the canal and throw it on the side of the adjacent bank. Their work is limited to either in the canal or right on the banks of the canal. Tegre testified that he has never used the camps for any parish work activities. He stated that, "we might have stopped there to, you know, use the bathroom or something like that, but that was it." None of the jobs that the parish work crews have done have taken longer than a normal working day. Further, he does not have keys to the camps and he knows of no parish policy with regard to the campowners giving parish personnel a set of keys. He knows of no agreement between the Parish and the campowners requiring them to clear out or take care of the canal in any manner.
Ricky Jacob testified that he is President of the Reserve Gun and Rod Hunting Club. He stated that on average he has personally removed debris from the canal approximately three times a year. His reason for removing the materials is for safety and passage; keeping the area clear *1215 around the camp benefits those who use the camp. Jacob further testified that he has never had any type of agreement with the Parish to clean the canal.
A right of use includes the rights contemplated or necessary to enjoyment at the time of its creation as well as rights that may later become necessary, provided that a greater burden is not imposed on the property unless otherwise stipulated in the title. La.C.C. art. 642. Rights that are necessary for the use of a servitude are acquired at the time the servitude is established. La.C.C. art. 743. They are to be exercised in a way least inconvenient for the servient estate. La.C.C. art. 743.
Upon review of the record, we find that the camp buildings and related club activities are not necessary to the Parish's enjoyment of its servitude. Accordingly, the trial court erred in issuing a permanent injunction against DWF, prohibiting it from removing, destroying or dismantling the camps and related structures located within the Parish servitude; and in finding that the Parish is within its rights of servitude to enter into leases of the existing camp buildings.
For the foregoing reasons, we vacate the permanent injunction and reverse the judgment of the trial court.
REVERSED.
DUFRESNE, J., dissents.
DUFRESNE, J., dissenting.
I respectfully dissent.
The camp members have historically accepted substantial responsibility for the canal maintenance. Their diligence in this regard has relieved St. John Parish of this burden for many years.
Further, to allow these camp members and their respective camps to remain on the property would not burden the LDWF at all. Although LDWF has indicated that this is against their policy, these camps and the present camp members should be "grandfathered" and allowed to remain.
Accordingly, I would affirm the trial court's judgment prohibiting LDWF from removing, destroying or dismantling these camps.
NOTES
[1] Frisco Hunting Club was dismissed from this suit, with prejudice, in a judgment dated June 20, 2005.
[2] A temporary restraining order was issued on March 27, 2002.
[3] In Louisiana, the word "estate" means a distinct corporeal immovable. See, section (b), 1977 Revision Comments for La.C.C. art. 646.